## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Greenbelt Division)

| | |
|---|---|
| IN THE MATTER OF THE ARBITRATION BETWEEN | Civil Action No. _____ |
| AO TECHSNABEXPORT, a legal entity organized and existing under the laws of the Russian Federation, | |
| Plaintiff, | **DECLARATION OF ANDREY YAKOVLEV IN SUPPORT OF CONFIRMATION OF FINAL AWARD** |
| and | |
| GLOBE NUCLEAR SERVICES AND SUPPLY GNSS, LIMITED., a Delaware Corporation, d/b/a GLOBAL NUCLEAR SERVICES AND SUPPLY LIMITED, | |
| Defendant. | |

I, **ANDREY YAKOVLEV**, hereby declare under penalty of perjury, as follows:

1.      I am authorized by AO Technsnapexport ("Tenex") to submit this Declaration, which is made from my personal knowledge.

2.      Attached as <u>Exhibit A</u> is a true and complete copy of the Final Award dated June 11, 2007, rendered in the arbitration captioned as Arbitration V (156/2003): Globe Nuclear Services and Supply GNSS, Limited ./. AO Techsnabexport in the Arbitration Institute of the Stockholm Chamber of Commerce ("Final Award").

3.      I am in the process of obtaining an apostilled copy of the Final Award for submission to this Court.

I declare under penalty of perjury that the foregoing is true and correct.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Executed on June 10, 2008

_____
Andrey Yakovlev

#1315122 v1
107997-61538

**ARBITRATION INSTITUTE OF THE STOCKHOLM CHAMBER OF COMMERCE**
P.O. Box 16050, SE-103 21 Stockholm, Sweden.
phone + 46-8-555 100 50, fax +46-8-566 316 50

# FINAL AWARD

rendered in Stockholm on 11th June 2007

**Case no:** 156/2003

| | |
|---|---|
| **Claimant:** | Globe Nuclear Services and Supply GNSS, Limited<br>3 Bethesda Metro Center, Suite 910<br>Bethesda MD 20814<br>USA |
| **Claimant's counsel:** | 1) Professor Kaj Hobér<br>Mr. Jakob Ragnwaldh<br>Mannheimer Swartling Advokatbyrå<br>Norrmalmstorg 4<br>SE–111 87 Stockholm<br>Sweden |
| | 2) Mr. Andrew K. Fletcher<br>Pepper Hamilton LLP<br>50th floor<br>500 Grand Street<br>Pittsburgh, PA 15219-2502<br>USA |
| **Respondent:** | AO Techsnabexport<br>Straromonetnyi per, 26<br>109180 Moscow<br>Russia |

**Respondent's counsel:**    1) Mr. Sigvard Jarvin
Mr. Carroll S. Dorgan
Jones Day
120, rue du Faubourg Saint-Honoré
75008 Paris
France

2) Mr. Timur D. Aitkulov
Mr. Ivan N. Marisin
Clifford Chance CIS Limited
ul. Gasheka 6
125047 Moscow
Russia

**Arbitral Tribunal:**    Justitierådet Gustaf Möller
Advokat Karl-Erik Danielsson
Professor Sergei N. Lebedev

TABLE OF CONTENTS

1 Introduction ..............................................................................................................4
2 Tenex's Position as to GNSS's standing in this arbitration and as to the validity of the
Contract ....................................................................................................................6
   2.1 Tenex's Prayers for Relief ..................................................................................6
   2.2 Grounds............................................................................................................6
3 GNSS's position.........................................................................................................12
   3.1 Tenex's standing argument fails ........................................................................12
   3.2 The Tribunal Lacks Jurisdiction over Criminal Matters.......................................13
   3.3 The GNSS-Tenex Contract is Valid ...................................................................13
4 Reasons.....................................................................................................................16
   4.1 Arbitrability.......................................................................................................16
   4.2 GNSS standing in this arbitration ......................................................................16
   4.3 The Tribunal's Jurisdiction and Criminal Matters ...............................................17
   4.4 Invalidity or unenforceability of the GNSS-Tenex Contract as a matter of Swedish law 17
      *4.4.1 Introduction* ..............................................................................................17
      *4.4.2    Invalidity pursuant to Section 30 of the Swedish Contracts Act (fraudulent
      deception)* ......................................................................................................18
      *4.4.3 Invalidity pursuant to Section 33 of the Swedish Contracts Act*...................19
         4.4.3.1 The ownership and control of GNSS and TKST........................................21
         4.4.3.2 The Acquisition by TKST of 49% of the shares in GNSS and Adamov's
         appointment as Minister of Minatom ...................................................................23
         4.4.3.3 Release and discharge of GNSS debt to Tenex.........................................30
         4.4.3.4 Conclusion of the GNSS-Tenex Contract ...............................................30
         4.4.3.5 The Circumstances in which the GNSS-Tenex Contract was concluded ..........35
         4.4.3.6 The Tribunal's conclusions .....................................................................37
   4.5 Costs................................................................................................................39
5 A W A R D..................................................................................................................40

# 1 Introduction

1. On 31st August 2006, this Tribunal rendered a Partial Award on Liability Issues. This was pursuant to a Procedural Order dated 11th November 2005, whereby the arbitration was bifurcated with separate pleadings and hearings on the issues of quantum to take place following the Partial Award on liability issues and subject to its findings and determinations. Pursuant to the same Procedural Order the Tribunal was later to decide whether and, if so, to what extent new evidence, which might come up in the then ongoing criminal investigations in Russia and the United States of America, would be allowed. If the Tribunal were to decide that such new evidence should be allowed, an oral hearing on the validity of Contract 08843672/1002-051D between GNSS and Tenex ("the **GNSS-Tenex Contract**") was provided for in the same Procedural Order (See ¶125 of the Partial Award). This Final Award presupposes a detailed knowledge of the Partial Award on Liability Issues and the two Awards should be read together.

2. The hearing on quantum issues took place in Stockholm on 25th – 27th September 2006. Before the hearing both parties had filed pre-hearing briefs, GNSS on 10th September 2006 and Tenex on 22nd September 2006. In addition, voluminous Exhibits were filed. Many of those Exhibits had been filed already before the above mentioned Procedural Order dated 11th November 2005.

3. Tenex has by e-mail on 1st December 2006 submitted a "BRIEF ON THE INVALIDITY OF THE GNSS-TENEX CONTRACT AND LACK OF STANDING" and Exhibit A. In the same e-mail Tenex informed the Tribunal that Exhibits 1-460 had been sent on 1st December 2006 by international courier.

4. In its Reply dated 6th December 2006 to a letter from the Tribunal dated 3rd December 2006, GNSS contended that the Tribunal should not consider Exhibits 1-460 because that "evidence is irrelevant, old and untimely" and that in this circumstance no hearing was necessary. If, however, the Tribunal did not agree, GNSS's position was that the hearing can and should take place as scheduled on 18th-20th December 2006 "after which the record in this arbitration must be closed and a final award must issue."

5. On 11th December 2006 the Tribunal having regard to a letter from Tenex dated 16th November 2006, a letter from GNSS dated 17th November 2006, Tenex's Brief dated 1st December 2006 with exhibit A and Exhibits 1-460, GNSS's reply dated 6th December 2006, a letter from Tenex dated 8th December 2006 and a letter from GNSS dated 8th December 2006, made a Procedural Order (PROCEDURAL ORDER No. 1/2006): In this order the Tribunal made the following rulings:

"I        New Evidence

As evidenced by courier service receipt (Exhibit 461), the new evidence (Exhibits 1-460), which has come up in the ongoing criminal investigations in Russia and the United States of America has been sent on 1 December 2006. The Arbitral Tribunal finds Tenex's request that this new evidence be allowed justified. Therefore, the Tribunal decides to allow the evidence.

II        Oral hearing

Since an oral hearing is found necessary and both parties have requested that an oral hearing, if held, shall take place on 18-20 December 2006, the Arbitral Tribunal confirms that an oral hearing will be held on those days.

The hearing will take place at Radisson SAS Strand Hotel AB Strand Hotel at Nybrokajen 9, Stockholm, Sweden. The hearing will commence on 18 December 2006 at 1 p.m. and, if necessary, go on until 20 December 2006 8 p.m."

6. The hearing on the validity of the GNSS-Tenex Contract took place in Stockholm on 18th – 20th December 2006. The Tribunal is once more indebted to the advocates who presented their submissions and evidence with characteristic lucidity and skill.

7. Even though the hearing on quantum issues took place before the hearing on the validity of the GNSS-Tenex Contract, the Tribunal deemed it appropriate to first deal with the question of validity of the Contract. In case the Contract would be found to be invalid or unenforceable, there would be no need to deal in the award with any quantum issues, including the qualification of the Contract. The quantum issues, including the qualification of the Contract, were the subject of the oral hearing referred to above at ¶ 2.

# 2 Tenex's Position as to GNSS's standing in this arbitration and as to the validity of the Contract

## 2.1 Tenex's Prayers for Relief

8. In its Brief on Invalidity of the GNSS-Tenex Contract and Lack of Standing dated 1st December 2006 Tenex request that the Tribunal

(i)   find that this dispute is non-arbitrable and dismiss GNSS claim in its entirety;

(ii)   in the event the Tribunal would find that this dispute is arbitrable, that the Tribunal find that the Contract is invalid or unenforceable and dismiss GNSS claim in its entirety; or

(iii)   in the event the Tribunal would for some reason find that the evidence presented by Tenex at this stage is not sufficient to conclusively establish the existence of the fraudulent scheme, postpone these proceedings and allow Tenex to collect new evidence. Such new evidence would be presented within a few months from 1st December 2006.

## 2.2 Grounds

9. An organised criminal group, including among others Mr. *Evgeniy Olegovich Adamov* (**"Adamov"**), former Minister of the Ministry for Atomic Energy of the Russian Federation (**"Minatom"**), Mr. *Mark Kaushansky* (**"Kaushansky"**), Mr. *Vyacheslav Dmitrievich Pismenny* (**"Pismenny"**), former Head of the State Scientific Centre Troitsky Institute of Innovative and Thermonuclear Research (**"TRINITI"**) and Chairman of the Board of Directors of GNSS, Mr. *Revmir Georgievich Fraishtut* (**"Fraishtut"**), former General Director of Tenex and a member of the Board of Directors of GNSS, and Mr. *Alexander Georgievich Chernov* (**"Chernov"**), President of GNSS, as well as some other individuals (together referred to as the **"Group"**), through TKST, Inc. (**"TKST"**) and then, Texi Inc. (**"Texi"**) obtained 62 % of the shares in GNSS and paid for 49% of the shares in GNSS with international assistance funds. Those funds, as asserted by the United States of America, had been stolen from the United States of America.

10. TKST was portrayed by the Group as a company that was ultimately owned by the Russian state through the state-owned TRINITI and was acting in Tenex's interests. Its President was Mr. Sergei Akimenko (**"Akimenko"**), who also was the President of Texi. While TKST was indeed owned by the Russian State, it was not controlled by the latter and was not acting in Tenex's interests; to the contrary it was defrauding Tenex. There was a secret agreement between Omeka Ltd (**"Omeka"**) and Texi, private companies controlled by, among others, Adamov and Pismenny, that TKST would buy 49 % of the shares in GNSS as an agent of Omeka and Texi. Tenex did not know of this secret arrangement and was induced to believe that TKST would buy the 49% of shares in GNSS for Tenex.

11. GNSS and/or the members of the Group, i.e. among others, Adamov, Chernov, Pismenny and Fraishtut  fraudulently induced Tenex to enter into the GNSS-Tenex Contract. Therefore GNSS lacks standing in this arbitration.

12. The Group fraudulently acquired the 49% of shares in GNSS from the bankruptcy estate of Nuexco Exchange AG (**"Nuexco"**). In particular, Adamov and Pismenny, with the assistance of other members of the Group:

- Entered into a secret arrangement whereby the 49% of shares in GNSS would be bought by TKST in the interest of Omeka and Texi, which companies were at that time privately owned by Adamov and Pismenny, among others;

- Adamov, as Minatom Minister, instructed Pismenny and Tenex to arrange for the sale of the 49% of shares in GNSS from the bankruptcy estate in order for Nuexco to TKST;

- The Group portrayed TKST as a company acting in Tenex's interests using *inter alia* the fact that TKST was ultimately owned by the Russian Federation (as was Tenex) and controlled by Minatom (through state scientific institute TRINITI);

- As a result of these actions by the Group Tenex was induced not to acquire the 49% of shares in GNSS either directly from Nuexco's bankruptcy estate (although Tenex, as the largest creditor of Mr. Oren Benton and his company Nuexco, was fully entitled to do so and, in particular, could have obtained such shares without payment, in lieu of part of the debt written off in the U.S) or through its subsidiary INTERNEXCO GmbH (**"INTERNEXCO"**), (although Tenex and INTERNEXCO concluded a written agreement specifically in this respect);

- Had Tenex known that there was a secret arrangement between, among others, Adamov and Pismenny, as a result of which TKST was not acting in Tenex's interests, Tenex would never have agreed to the sale of these shares to TKST and would have acquired them either in its own name or in the name of INTERNEXCO.

13. Moreover, the money transferred by the Group for the 49% of shares in GNSS was international assistance funds contributed by the United States and other nations for installing safety upgrades at nuclear power plants in Russia and Eastern Europe, which were used for various business investments of Adamov and Kaushansky. US$ 250,000 that was used by the Group to pay for the 49 % of shares in GNSS was wired, "on behalf of Omega", from Energopool Inc. (**"Energopool-DE"**), which was the company to which international assistance funds were transferred by Western donors.

14. Moreover, the Group introduced the state-owned company "Priargunskoye Proizvodstvennoye Gorno-Khimischeskoye Obyedinenyie" (**"Priargunskoye"**), which owned 13 % of the shares in GNSS  to transfer its  stake in GNSS for no consideration.

15. Priargunskoye was a state-owned company operating under the auspices of Minatom.  Priargunskoye's General Director Mr. Larin (**"Larin"**) was Adamov's subordinate and it was therefore possible to make him dispose of Priargunskoye's shares in GNSS.

16. The share certificates of Priargunskoye were with Arthur Andersen. On 19th July 1999 Priargunskoye (represented by Larin) instructed Arthur Andersen to provide Pismenny, as Priargunskoye's representative, with Priargunskoye's share certificates for its shares in GNSS. Priargunskoye expressly stated the reason for this instruction in a letter to Arthur Andersen of the same date:

    the share certificates *"are going to be used for proper registration of foreign investment with Russian official registration authorities."*

17. However, the purpose was to transfer ownership of Priargunskoye's share certificate for shares in GNSS to TKST. In fact, on 10th August 1999, shortly after Pismenny obtained the certificates for the purpose of *"proper registration"*, Priargunskoye's shares were transferred to TKST for no consideration.

18. As a result, the Group and any of the companies under its control, including TKST and/or Texi, cannot be considered legitimate owners of the shares in  GNSS. In par-

ticular, they do not have authority to appoint executive bodies of GNSS and/or other representatives of GNSS. This means that the appointment of Chernov to the post of President of GNSS was invalid and, accordingly, appointment of GNSS's counsel by Chernov was also invalid. Thus, these proceedings were initiated by unauthorised representatives of GNSS and should be terminated. GNSS's counsel does not have requisite authority to represent GNSS in this arbitration. Thus, GNSS lacks standing in this arbitration. For the above reasons alone GNSS's claim should be rejected in its entirety.

19. GNSS fraudulently induced Tenex to enter into the GNSS-Tenex Contract. GNSS and/or the members of the Group, including Adamov, Pismenny, Chernov and Fraishtut, led Tenex to believe that TKST, which owned 62% of the shares in GNSS (the other 38% of the shares in GNSS being owned by Tenex), was a company ultimately owned by the state and controlled by Minatom, and that TKST was acting in the interest of Tenex. The Group concealed the fact that there was a secret arrangement that TKST would act in the interests of Omeka and Texi, which were controlled by the Group.

20. GNSS and/or the Group acted intentionally in order to induce Tenex to (1) refrain from purchasing shares in GNSS, (2) gratuitously release GNSS's debt to Tenex and finally (3) enter into the GNSS-Tenex Contract.

21. GNSS and/or the Group knew that Tenex was entering into the GNSS-Tenex Contract on the assumption that TKST was owned by the state and controlled by Minatom and that GNSS was a company owned and controlled by Tenex and/or Minatom, but concealed the fact that because of the secret arrangement between Adamov and Pismenny, among others, this assumption was not true.

22. Therefore, the GNSS-Tenex Contract is invalid or unenforceable as a matter of Swedish law and international public policy.

23. The GNSS-Tenex Contract is invalid or unenforceable on the basis of (1) Section 30 of the Swedish Contracts Act and/or (2) Section 33 of the Swedish Contracts Act, and/or (3) the non-codified principle of underlying assumptions, which provides that certain legal acts are invalid if the underlying assumptions are incorrect or changed, and/or (4) the general principle enshrined in Swedish law that agreements which violate the law or are contrary to good practice are not protected by law.

24. The Swedish Contracts Act, Chapter 3, Section 30 reads (in its English translation) as follows:

*"Where a person in respect of whom a legal act is performed has induced the performance of the act by fraudulent deception, or where such party knew, or should have known, that the act was induced by fraudulent deception on the part of the third party, such act shall not be binding on the person fraudulently deceived.*

*Where a person in relation to whom a legal act is performed has fraudulently represented or withheld facts which may be presumed to be material in relation to the act, such person shall be deemed to have thereby induced the legal act, unless it is shown that such legal act was not influenced by fraud."*

25. In this case the act, i.e. the GNSS-Tenex Contract, was performed in respect of GNSS. GNSS induced the performance of the act, i.e. the conclusion of the GNSS-Tenex Contract, by fraudulent deception. GNSS induced the conclusion of the GNSS-Tenex Contract by fraudulently representing and/or withholding facts which could be presumed to be material in relation to the GNSS-Tenex Contract, i.e. that there existed a fraudulent scheme, a part of which was, *inter alia*, a secret arrangement pursuant to which TKST, and accordingly, GNSS acted in the interest of the Group, and not in Tenex's interest. Therefore, the GNSS-Tenex Contract cannot, pursuant to Section 30 of the Swedish Contracts Act, be binding on the person so fraudulently deceived, i.e. Tenex.

26. The GNSS-Tenex Contract would be invalid pursuant to Section 30 of the Swedish Contracts Act if, on the evidence before it, the Tribunal finds that: (i) GNSS, through its representatives, either (1) intentionally made misrepresentations to or concealed facts from Tenex, or (2) was aware or should have been aware that a third party had made misrepresentations to or concealed facts from Tenex, and (ii) those facts were material to Tenex's decision to enter into the GNSS-Tenex Contract. GNSS concealed the existence of the fraudulent scheme and Tenex would not have entered into the GNSS-Tenex Contract had it known of the fraudulent scheme.

27. Section 33 of the Swedish Contracts Act reads (in its English translation) as follows:

*"A legal act which would otherwise be deemed valid may not be relied upon where the circumstances in which it arose were such that, having*

*knowledge of such circumstances, it would be inequitable to enforce*

*the legal act, and where the party in respect of whom such legal act*

*was performed must be presumed to have had such knowledge."*

28. The GNSS-Tenex Contract is invalid also pursuant to Section 33 of the Swedish Contracts Act, since it forms part of a fraudulent scheme and GNSS, through its representatives, was aware of the fraudulent scheme when the GNSS-Tenex Contract was concluded. In fact, representatives of GNSS, including Pismenny, the Chairman of the Board of Directors of GNSS, were active participants of this fraudulent scheme.

29. The Swedish law principle of underlying assumptions provides that agreements or legal acts may be declared invalid where the following requirements are met:

- the assumption must have been essential to or decisive for the person performing the legal act in question. In other words, the person would not have performed the legal act had that person known the assumption was wrong or if he had known of the subsequent changes;

- both the existence of the assumption and its importance must have been evident for the other party. Hence, the other party must have realised or should have realised that the party performing the legal act relied on the assumption and would not have performed the legal act in its absence.

30. The GNSS-Tenex Contract is also invalid by virtue of the Swedish principle of underlying assumptions since (i) Tenex entered into the GNSS-Tenex Contract under certain assumptions that are now proved wrong and (ii) GNSS must have realised that Tenex relied on these assumptions and would not have entered into the GNSS-Tenex Contract in their absence.

31. GNSS was aware of the fact that (1) the assumption that GNSS was ultimately controlled by Tenex and Minatom was important for Tenex when concluding the GNSS-Tenex Contract and that (2) this assumption was wrong because of the fraudulent scheme, which entailed secret arrangements between, among others, Adamov and Pismenny.

32. Under general principles of Swedish law an agreement which violates the law or is contrary to good practice, a *pactum turpe*, is invalid. This is indeed the case with agreements where a person undertakes to commit a criminal act or to do something that manifestly violates generally accepted morals or standards. Pursuant to Swedish law a *pactum turpe* is not protected by the legal system. Thus, neither a court nor an

arbitral tribunal may enforce a *pactum turpe*. Indeed the preparatory works to the Swedish Arbitration Act expressly mention that a dispute concerning a *pactum turpe* is non-arbitrable and, consequently, that any such award is invalid.

33. Since the GNSS-Tenex Contract forms part of a greater fraudulent scheme, the GNSS-Tenex Contract is invalid under Swedish law and hence could not be enforced in relation to Tenex.

34. The GNSS-Tenex Contract was part of a larger illegal scheme through which the Group, headed by the Minatom Minister, fraudulently obtained control of the GNSS with the intention of divesting profits from sales of HEU Feed from Tenex and the Russian Federation and allocating them to the Group. To obtain control of GNSS, the Group used, as asserted by the United States, stolen money. The proceeds from such activities, including profits from the GNSS-Tenex Contract, were distributed among the members of the Group. Substantial amounts were paid to Adamov at the time when he was Minatom Minister and after that.

35. Therefore, the present dispute, in which GNSS claims proceeds of its and the Group's fraudulent actions, is not arbitrable. Should the Tribunal find that this dispute is arbitrable, then it should acknowledge the invalidity of the GNSS-Tenex Contract and dismiss GNSS's claim in its entirety.

36. The GNSS-Tenex Contract is invalid or unenforceable as a matter of international public policy. The GNSS-Tenex Contract was induced by fraud and corruption, in which, among others, the former Russian Minatom Minister was involved. The suppression of fraud, corruption and money laundering is an established part of international public policy and must be respected by international arbitrators. Thus GNSS's claim should be rejected in its entirety.

# 3 GNSS's position

## 3.1 Tenex's standing argument fails

37. GNSS contend that, as can be seen from the minutes of the preparatory meeting held at hotel Arlanda in Arlanda airport on 21st July 2004, Tenex has waived any argument regarding whether GNSS is a proper party to this arbitration. On page 2 of those minutes one can find the following sentence:

*"With respect to jurisdiction the Respondent informed that it accepted the Claimant as the proper party to these proceedings."*

38. Thus, Tenex's standing argument is precluded and must be disregarded since it is presented too late. Moreover, none of Tenex's standing argument is valid under Delaware law (GNSS is a Delaware corporation, which is governed by Delaware corporate law). Tenex does not even attempt to argue otherwise.

## 3.2 The Tribunal Lacks Jurisdiction over Criminal Matters

39. The arbitration clause does not cover criminal matters. *First*, the arbitration clause of the GNSS-Tenex Contract (Article 11.02) only covers any "...claim arising out of or relating to this Contract..." and stipulates that any such claim "shall be exclusively settled in accordance with the Rules of the [SCC Institute]".The criminal charges against Adamov and others do not arise out of or relate to the GNSS-Tenex Contract, nor can they be "exclusively settled by arbitration". Such claim cannot be settled under the Rules of the SCC Institute.

40. *Secondly*, pursuant to Section 1 of the Swedish Arbitration Act criminal matters are not arbitrable.

## 3.3 The GNSS-Tenex Contract is Valid

41. GNSS is entitled to have the GNSS-Tenex Contract enforced since the Contract is valid. The investigations and criminal proceedings are not relevant to this arbitration; they do not affect or relate to the core issues of breach of contract before this Tribunal or to any valid defence Tenex may raise to these allegations. The transfer of shares in GNSS is irrelevant to the question of the validity of the GNSS-Tenex Contract. Also the release and discharge of debt is irrelevant to the question of the validity of the GNSS-Tenex Contract.

42. Section 30 of the Swedish Contracts is given a very narrow interpretation. It is very seldom applied by courts. There are in the last 60 years only a few cases in which this provision has been applied.

43. According to Tenex, the fraud and conspiracy is that Adamov illegally instructed Fraihstut to enter into the GNSS-Tenex Contract. Tenex's criminal allegations do not make out a case of fraudulent inducement. The Swedish Contracts Act Section

30 applies only where "a person in respect of whom a legal act is performed has induced the performance of the act by fraudulent deception,…such act shall not be binding on the person fraudulent deceived." The "persons" in this case are corporations: GNSS and Tenex. For Tenex's argument to work, it would need to show that GNSS fraudulently deceived Tenex.

44. Tenex identifies no misrepresentation by GNSS, and no resulting reliance by Tenex that purportedly caused the Contract's making. Instead, Tenex describes an internal dialogue, not between Tenex and GNSS, but rather one within the family: between Tenex and the Ministry it has admitted to serving as "agent" for, *viz.*, Minatom. The "fraud" alleged is an instruction from Adamov to Fraishtut. Tenex alleges no action at all by GNSS, let alone a deception by GNSS that induced the GNSS-Tenex Contract, before the Tribunal.

45. Tenex also argues that the GNSS-Tenex Contract is invalid because "GNSS and/or members of the Group acted…to induce Tenex to: (1) refrain from purchasing shares in GNSS, (2) gratuitously release GNSS's debt to Tenex, and finally (3) enter into the GNSS-Tenex Contract."

46. These allegations, even if true, do not describe a claim for invalidity because the "Group" perpetrating this alleged "fraud" includes Russia's Minister of Atomic Energy (Adamov). Thus Tenex is arguing that Tenex is both the perpetrator and alleged victim of an alleged fraud. This cannot form the basis for invalidating a contract under Swedish law.

47. The Swedish Contracts Act Section 30 applies only "where a person in respect of whom a legal act is performed has induced the performance of the act by fraudulent deception,…such act shall not be binding on the person fraudulently deceived." Tenex alleges that its own General Director participated in the alleged "fraud". If this is true, Tenex cannot demonstrate that it was "fraudulently deceived" into signing the GNSS-Tenex Contract.

48. The same reasoning rebuts Tenex's reliance on Section 33 of the Swedish Contracts Act and the theory of assumptions, because according to Tenex's allegation both parties to the Contract had knowledge of the circumstances under which it was entered into. In such circumstances, neither Section 33, nor the theory of assumptions could possibly operate to invalidate the GNSS-Tenex Contract.

49. Moreover, Section 33 of the Swedish Contracts Act is given a very narrow interpretation. It is very seldom applied by courts. There are in the last 60 years only a few

cases in which this provision has been applied. Also the doctrine of assumption has very seldom been applied by courts. This doctrine is often called in question.

50. As a threshold matter, for all these legal grounds there must be a perpetrator and a victim. In this case, according to Tenex's own admission, Tenex was on the same side as GNSS with respect to the purported "fraud". Hence, even if true (which GNSS vigorously opposes), Tenex's allegations do not lead to invalidity of the GNSS-Tenex Contract.

51. The GNSS-Tenex Contract is not invalid or unenforceable as a matter of *ordre public*. For *ordre public* to apply, the fundamental purpose of the contract must be illegal itself (e.g. bribery) which is not the case here. In contrast to the bribery cases cited by Tenex, the GNSS-Tenex Contract was an agreement for the sale of uranium, endorsed by both governments, performed by the parties for years, and under which Tenex received every penny of what it billed to GNSS. Tenex had repeatedly extolled the Contract's critical importance to the sovereign. Tenex now calls a contract "corrupt" when once upon a time it held that contract out as a classic example of a sovereign function. The Russian Federation has changed its policy, and so long as it pays appropriate compensation to those affected by this change, it may do so – but this does not make the former policy "illegal".

52. Tenex's argument that the contract is contrary to public policy (*ordre public*) has nothing to do with *international public policy*. The GNSS-Tenex Contract is one for the sale of goods and is not remotely close to the kinds of contracts overturned on public policy grounds. After having decided to replace GNSS and sell directly to GNSS's customers, Tenex now contend that the Contract is contrary to the "public policy" of the Russian Federation.

53. Accordingly, whether the Tribunal looks at Swedish law, arbitral precedent, or Tenex's own pleadings, the answer is the same. Tenex fails to plead a valid claim of *ordre public*. Lacking the nexus of a valid defence, the criminal allegations are by definition irrelevant.

54. Finally, Tenex does not even meet its burden of proof.

# 4 Reasons

## 4.1 Arbitrability

55. The question of arbitrability of the present dispute is governed by Swedish law (*cf.* also the Partial Award dated 31st August 2006 ¶¶333 and 334). Pursuant to Section 1 of the Swedish Arbitration Act, disputes concerning matters in respect of which the parties may reach a settlement are arbitrable. The present dispute concerning the validity or enforceability of the GNSS-Tenex Contract is a matter which the parties may settle even if either party had induced the conclusion of the Contract by a criminal act. Thus this is the case, even if GNSS's claims would proceed of its and the Group's fraudulent actions. Thus we find Tenex's request, that the Tribunal find the dispute to be non-arbitrable and on this ground dismiss GNSS's claim, in its entirety unfounded.

## 4.2 GNSS standing in this arbitration

56. It is true, as GNSS asserts, that, according to the minutes of the preparatory meeting, held at hotel Arlanda in Arlanda airport, on 21st July 2004, Tenex "informed that it accepted the Claimant as the proper party to these proceedings". However, Tenex's statement must be seen in the light of the fact that Tenex in its Reply to GNSS's Request for Arbitration dated 23rd January 2004 and in its rejoinder to GNSS Reply dated 17th February 2004 had contended that the Claimant in this arbitration is another legal entity than the one with which Tenex had concluded the GNSS-Tenex Contract. This allegation was based on the fact that the GNSS-Tenex Contract provides in its first paragraph that "Globe Nuclear Service and Supply GNSS Limited" is a Swiss corporation. On this ground Tenex contended that GNSS lacked standing and that the SCC Institute had no *prima facie* jurisdiction over the dispute.

57. The ground on which Tenex now contends that GNSS lacks standing in this arbitration (*supra* ¶¶9-18) is completely different. Therefore, it is open to doubt whether Tenex as a result of its statement at the above mentioned preparatory meeting on 21st July 2004 (*supra* ¶56) can be deemed to have waived any argument relating to

the question whether GNSS lacks standing in this arbitration. In particular, the point
of time when Tenex became aware of the facts on which it relies in support of its al-
legation may be relevant in this context.

58. However, there is no evidence that Tenex's standing arguments would be valid un-
der Delaware law or any other law that could possibly be relevant in this context.
Thus, it has not been established that GNSS lacks standing in this arbitration. We
observe, in passing, that given our findings, the Tribunal has not needed to consider
GNSS's allegation that Tenex has waived any argument regarding whether GNSS is
a proper party to these proceedings.

## 4.3 The Tribunal's Jurisdiction and Criminal Matters

59. As GNSS asserts, the arbitration clause in the GNSS-Tenex Contract does not cover
criminal matters. GNSS is equally right in asserting that pursuant to Section 1 of the
Swedish Arbitration Act criminal matters are not arbitrable. However, this does not
mean that the Tribunal, when considering the validity and enforceability of the
GNSS-Tenex Contract, may not take into account such facts that also may consti-
tute a criminal offence or, as an incidental question, decide whether a certain act or
omission constitutes an offence, and consider the civil aspects thereof. The arbitra-
tion clause in the GNSS-Tenex Contract provides, *inter alia*, explicitly that any
"dispute, controversy or claim arising out of or relating to this Contract or the
breach, termination or invalidity thereof, shall be exclusively settled by arbitra-
tion…". GNSS's allegation that the Tribunal lacks jurisdiction to consider such
facts that also may constitute a criminal act or omission is thus in its entirety un-
founded.

## 4.4 Invalidity or unenforceability of the GNSS-Tenex Contract as a matter of Swedish law

### 4.4.1 Introduction

60. Tenex contend that the GNSS-Tenex Contract is invalid or unenforceable as a mat-
ter of Swedish law on several different grounds. To begin with, we note that GNSS
has not objected to or called into question any specific evidence or document sub-

mitted by Tenex in support of its contention that the GNSS-Tenex Contract is invalid or unenforceable. We further note that the Danish, Norwegian and Swedish Contract's Act prepared and enacted during the second decade of the 20th century and can even after some amendments made later be regarded as uniform laws. In order to achieve uniformity in the field of contracts law in the Nordic countries, Finland adopted in 1929 a Contracts Act. The Finnish Contracts Act is with very few exceptions, which are of no relevance in this context, literally uniform with the Swedish Contracts Act.

61. We shall first deal with the contentions that GNSS induced the performance of the act, i.e. the GNSS-Tenex Contract, by fraudulent deception and that the GNSS-Tenex Contract forms part of a fraudulent scheme and that GNSS, through its representatives, was aware of this fact when the GNSS-Tenex Contract was concluded. Those alleged facts obviously reflect seriously upon the integrity, good faith and reputation of GNSS and its senior executives. Obviously, if the GNSS-Contract corresponds to both parties' assumption at time when the Contract was concluded, a claim that the Contract is invalid or unenforceable cannot found in fraud. However, because of the serious allegations against individuals in particular, and since the so-called doctrine on assumptions is often called into question, we have decided first to address the claims based on Sections 30 and 33 of the Swedish Contracts Act.

## 4.4.2 Invalidity pursuant to Section 30 of the Swedish Contracts Act (fraudulent deception)

62. What is the evidence for Tenex's contention that the GNSS-Tenex Contract was induced by fraudulent deception or that the GNSS-Tenex Contract forms part of a fraudulent scheme and that GNSS, through its representatives, was aware of this fact when the GNSS-Tenex Contract was concluded?

63. The GNSS-Tenex Contract was signed on 31st of January 2000, on behalf of GNSS by Pismenny and Chernov and on behalf of Tenex by Fraishtut and Mr. Alexey Grigoriev ("**Grigoriev**"), who at that time was a Deputy General Director and the Commercial Director of Tenex. On 22nd December 1999, Pismenny was elected Chairman of the Board of Directors of GNSS (Exhibit 267) and shortly afterwards, Fraishtut, who had become General Director of Tenex at the end of January 1999, joined Pismenny on the Board of Directors of GNSS. Tenex does not even suggest

that Fraishtut when signing the GNSS-Tenex Contract believed that GNSS was a company wholly owned and controlled by Tenex or Minatom. On the contrary, Tenex contend that Fraishtut was a member of the Group and that, when the GNSS-Tenex Contract was concluded, everyone, except the Members of the Group, at Tenex and Minatom believed that GNSS was a company wholly owned by Tenex and Minatom. Thus it is plain that Tenex's General Director Fraishtut, when signing the GNSS-Tenex-Contract on behalf of Tenex, was not induced by fraudulent deception to conclude the GNSS-Tenex Contract.

64. Under Article 13 of Tenex's Charter the GNSS-Tenex Contract had to be signed by two officers of Tenex. Tenex contend that Grigoriev affixed the second signature to the GNSS-Tenex Contract only after Fraishtut had assured him that GNSS continued to be controlled by Minatom. This contention is evidenced by the statement Grigoriev made when he was examined as a witness under questioning by the General Prosecutor's Office.

65. In his witness statement  (Exhibit 366 page 4) Grigoriev said, *inter alia*, as follows:

> "*Having signed the contract, Mr. Fraishtut suggested that I put my signature on the contract with GNSS as a second one, required by Techsnabexport's procedure. I put my signature on the contract proceeding from the fact that the contract had already been signed by Mr. Fraishtut. Moreover, I confirmed it with Mr. Fraishtut that GNSS was still controlled by RF Ministry of Atomic Energy, and he assured me that GNSS was under the Ministry's control.*"

66. As mentioned above (*supra* ¶63), Tenex contend that Fraishtut was a member of the Group and thus aware of the fact that GNSS was not under the control of Tenex or Minatom. Since Fraishtut was the General Director of Tenex and signed the GNSS-Tenex Contract on behalf of Tenex, we find, that Tenex cannot be deemed to have been fraudulently induced to conclude the Contract. The fact that also Grigoriev signed the Contract, after Fraishtut had assured him that GNSS continued to be controlled by Minatom, is, in the Tribunal's view, in this context not relevant.

## 4.4.3 Invalidity pursuant to Section 33 of the Swedish Contracts Act

67. We shall now consider whether the GNSS-Tenex Contract is invalid pursuant to Section 33 of the Swedish Contracts Act. This provision is verbatim identical with

Section 33 of the Finnish Contracts Act. As mentioned above at ¶ 27 the provision reads in its English translation as follows:

> *"A legal act which would otherwise be deemed valid may not be relied upon where the circumstances in which it arose were such that, having knowledge of such circumstances, it would be inequitable to enforce the legal act, and where the party in respect of whom such legal act was performed must be presumed to have had such knowledge."*

68. In order for Section 33 of the Swedish Contracts Act to apply, both an objective and a subjective requirement must be fulfilled. As regards the *objective* requirement, the circumstances in which the act arose must be such that, having knowledge of such circumstances, it would be inequitable to enforce the legal act. However, the provision does neither define such circumstances nor even mention examples of such circumstances. It is thus ultimately for a court or an arbitral tribunal to exercise its discretion when determining whether the circumstances were such that the objective requirement might be fulfilled. The provision refers to the circumstances at the time of the making of a contract, not to anything that happened later, nor to the contents of the contract, and the effect depends on what the party acting contrary to good faith "must" know at the time of making.[1] In case a party cannot even be presumed to have had knowledge of the circumstances, his conduct cannot be inequitable. Thus, as regards the *subjective* requirement, the party must be presumed to have had knowledge of these circumstances at the time of making of the contract. However, there is no requirement that he has regarded his conduct to be inequitable or even thought that his conduct may be regarded inequitable.

69. As a result of the vague wording of the provision, Section 33 of the Swedish Contracts Act has a wide range of application. As Sections 28-32 of the Swedish Contracts Act (duress, fraudulent deception, undue influence and mistake), Section 33 relates to circumstances occurring at the time of the making of a contract. According to its wording it also encompasses situations covered by other, more specific, grounds for invalidity set forth in Chapter 3 of the Swedish Contracts Act. It is, however, plain that the provision aims at such cases in which the other more specific grounds for invalidity set out in Chapter 3 of the Swedish Contracts Act do not

---

[1] *Hellner* in Strömholm, (ed.), An Introduction to Swedish Law, 1988, p.240.

apply. Thus, the more general provision in Section 33 of the Swedish Contracts Act supplements the other more specific provisions of Sections 28-32 of the Swedish Contracts Act.[2] In practice Section 33 of the Swedish Contracts Act has been applied mostly in situations which resemble those governed by the other, more special rules of the chapter, but where the circumstances are somewhat attenuated.[3]

70. However, the supplementary nature of Section 33 of the Swedish Contracts Act does not mean that an application of the provision is excluded as soon as a contract may be invalid on a more specific ground, in particular in the event this more specific ground is set out in other legislation than Chapter 3 of the Swedish Contracts Act. There is no support for a contrary view in the wording of the Swedish Contracts Act or in its *travaux préparatoires*.[4] Neither does there seem to be any support for a contrary view in case law nor in legal literature.

71. According to Swedish law a court or an arbitral tribunal may not declare a contract invalid because of any other fact than a fact which a party has invoked as a ground in support of his contention that the contact is invalid. [5]We have found above that the contract is not invalid pursuant to Section 30 of the Swedish Contracts Act because of fraudulent deception, which is the only other ground for invalidity set out in Chapter 3 of the Swedish Contracts Act which has been invoked by Tenex. The other grounds for invalidity invoked by Tenex are not set out in Swedish legislation.

72. Thus, the question is (a) whether there is evidence that the circumstances in which the GNSS-Tenex Contract was concluded were such that it would be inequitable if GNSS, having knowledge of those circumstances at the time when the contract was concluded, could rely on the Contract and (b) whether there is evidence that GNSS must be presumed to have had such knowledge when the GNSS-Tenex Contract was concluded.

## 4.4.3.1 The ownership and control of GNSS and TKST

73. When the GNSS-Tenex Contract was concluded TKST owned 62 % of the shares in GNSS. The remaining 38% of the shares were owned by Tenex.

---

[2] See, e.g. *Hellner*, op.cit., p.239 p. and *Grönfors*, Avtalslagen, 3 ed, 1995, p 207

[3] See e.g. *Hellner*, op cit. 240. and *Ramberg-Hultmark*, Allmän avtalsrätt, 5 ed. 1999.

[4] See Förslag till lag om avtal och andra rättshandlingar på förmögenhetsrättens område, lag om avbetalningsköp m.m. avgivna den 31 januari 1914 av därtill utsedda kommitterade. Stockholm 1914

[5] See *Heuman*, Skiljemannarätt, 1999, p.618.

74. TKST had in December 1999 bought 49% of its shares in GNSS from the bankrupt's estate of Nuexco (Exhibits 329-332). On 17th December 1999 GNSS's directors approved registration of TKST as a new shareholder (Exhibit 344) and again approved this on the board meeting on 20th December 1999 (Exhibit 345). On 10th August 1999, TKST acquired from Priargunskoye, a Russian state owned enterprise operated by Minatom, 13% of the shares in GNSS.  On 20th December 1999 the Board of Directors of GNSS approved the transfer of Priargunskoye's shares in GNSS to TKST (Exhibit 345). As a result of those transfers TKST obtained a controlling stake in GNSS (62 %).

75. TKST was ultimately owned by the Russian state through the state owned TRINITI scientific institute. The Institute was headed by its Director Pismenny from July 1978 to December 2003. As can be seen from the Charter of TRINITI (Exhibit 213 and 215), the director is the chief executive officer of TRINITI and appointed by the Minister of Minatom on a contractual basis and will be accountable to him. TRINITI is a state scientific institution controlled by Minatom. Minatom approved the Charter of TRINITI and all amendments thereto. TRINITI has the organisational form "state unitary enterprise of Minatom". TRINITI was thus controlled by the Minister of Minatom, i.e. Adamov.

76. In the early 1990s TRINITI had a U.S. subsidiary incorporated in Utah, TRINITY Kuratchov Science Technology, Inc., acronym "TKST" (**"TKST-Old"**). TKST-Old was liquidated in the mid-1990s (Exhibits 217-219).

77. TKST (whose name is the same as the acronym for TKST-Old) was incorporated in 1993 in Pennsylvania. As shown by a share certificate (Exhibit 223), TRINITI owned all 100 shares in TKST. The Deputy Director of TRINITI Vladimir Cherkovets (**"Cherkovets"**) testified on 28th November 2000 before a senior investigator of the Investigation Division of the Federal Security Service of Russia (Exhibit 224) that in 1994 there was no longer a need for further operation of the TKST-Old and accordingly, Pismenny instructed the president of TKST-Old Akimenko to terminate the existence of TKST-Old in the United States.

78. Cherkovets further testified as follows:

> *"During the same period Akimenko left the institute and moved with his family to Pennsylvania. There he created another company under the name of TKST..., where he assumed the post of president....*

*When the company was created it issued 100 shares of stock with no*

*value, which Akimenko transferred to our institute, represented by its*

*director Pismenny...*

*Also in 1994, the institute signed with TKST an agreement to supply*

*limited quantities of office equipment, but from that time until the pre-*

*sent day I have no information of the business of this company.*

*Based on the documents held at the institute and made available to the*

*investigation the president of the TKST corporation is Akimenko, while*

*the owner is RF SCC TRINITI."*

79. As can be seen from a "Written Consent of Board of Directors of TKST" dated 4th April 2000 (Exhibit 234) Pismenny was also a Director of TKST.

80. On the evidence before us we find it plain that TKST was a state company owned by TRINITI and controlled by Pismenny and Adamov.

## 4.4.3.2 The Acquisition by TKST of 49% of the shares in GNSS and Adamov's appointment as Minister of Minatom

81. After Oren Benton and five of his U.S. Companies, among which was Nuexco Trading Corporation ("**NTC**"), had filed for bankruptcy in the United States, Nuexco filed for bankruptcy in Switzerland in March 1996 ( Exhibits 33 and 21). Mr. Richard Butz ("**Butz**") was appointed Nuexco's liquidator and was to dispose of Nuexco's 49 % shares in GNSS.

82. As can be seen from the "Release and Waiver" from Tenex in favour of GNSS dated 31st of December 1999 (RX 144), as of 1999 GNSS owed Tenex more than US$ 113 million for various uranium deliveries purchased by GNSS for Nuexco, NTC and other Benton Companies.

83. It seems to have been the intention of both Tenex and GNSS itself, from the outset of Nuexco's bankruptcy, that Nuexco's 49 % of the shares in GNSS would be transferred to Tenex. This can be seen, *inter alia*, from the Report dated 28th February 1996 on GNSS Activities in 1995 (Exhibit 28). In this Report Chernov stated, among other things, as follows:

*"1. In 1996 work should be completed for the transfer of the 49 % in-*

*terest in GNSS that currently belongs to Nuexco Exchange AG to Rus-*

*sian shareholders."*

84. Moreover, from the Minutes of the Board of Directors Meeting of GNSS held on 28th March 1997 (Exhibit 31) it can be seen that the transfer of Nuexco's shares (49 % of GNSS) to Tenex was then under negotiation.

85. As can be seen form the Decree of the President of the Russian Federation No. 226 dated 4th March 1998 (Exhibit 44), Adamov was appointed Minister of Minatom on the same day.

86. After Adamov's appointment Tenex continued to work towards getting control of the 49% of shares in GNSS.  Certain events delayed the process.

87. As can be seen from Pleiades Group's ("**Pleiades**") Request for Arbitration dated 18th December 1998 (Exhibit 18) Pleiades alleged that Tenex was obliged to arrange for the transfer of 49% of the shares in GNSS to Pleiades pursuant to an agreement on Joint Venture Activity.

88. Moreover, as evidenced by letters dated 8th and 30th April 1998 (Exhibits 178-179) from White & Case to Tenex, a Brazilian Company, INB (a creditor of Nuexco) opposed the transfer of 49% of the shares in GNSS to Tenex.

89. In addition, as evidenced by a circular letter in the bankruptcy proceedings concerning Nuexco (Exhibit 180), a non-creditor of Nuexco had offered CHF 175,000 for 49% of the shares in GNSS. In this circular letter Butz requested that all interested parties submit their offers by 31st August 1998.

90. By letter No 1201/4504 of 13th August 1998  (Exhibit 182) Tenex confirmed to its lawyer at White & Case (Carolyn Lamm) that it was "strongly interested in acquiring" these 49% shares in GNSS.

91. By letter dated 28 August 1998 (Exhibit 192)  White & Case advised Tenex to use its German subsidiary INTERNEXCO *"to bid and ultimately purchase the shares"*, since two Russian Central Bank approvals would be required in order  for Tenex to purchase the GNSS shares and the approval process took approximately six months. In the same letter it was said that Tenex can then purchase the shares from INTERNEXCO after obtaining the required approvals.

92. Tenex had already earlier made arrangements for purchase of the shares through INTERNEXCO. By letter of 21st August 1998 to Tenex (Exhibit 188) INTERNEXCO informed Tenex that it will follow Tenex's proposal to bid on behalf of Tenex for the 49 % GNSS share package. After having got the  aforementioned letter from White & Case dated 28th August 1998, Tenex immediately signed an agreement with INTERNEXCO according to which INTERNEXCO would bid

for the shares and then sell them to Tenex and instructed INTERNEXCO to *"start with the procedure of the acquisition of 49% GNSS shares from the Bankruptcy Authority...."* (Exhibit 199).

93. Tenex contends that Adamov instructed Pismenny in the autumn of 1998 to arrange for preliminary work on the purchase of 49% of the shares in GNSS by TKST. As evidence for this contention Tenex has presented an undated letter from Pismenny to Adamov, in which Pismenny referred to such instructions and a record of questioning Adamov by the RF Prosecutor General's Office. The text of the letter (Exhibit 196) reads as follows:

> *"In connection with the instruction that you gave by telephone to organise the preparatory works for TKST, Inc. to acquire shares in GNSS, I need to change the itinerary of my trip and the time I am permitted to spend abroad in order that I can go to Switzerland and return from Zurich on 16 September 1998.*
>
> *Please give your consent to these changes."*

94. According to the Record of the questioning Adamov by the Prosecutor General's Office dated 11th March 2001 (Exhibit 197), Adamov said at this questioning, *inter alia,* as follows:

> *"Question: Did you instruct V.D. Pismenny, in the autumn of 1998 to carry out preparatory work for the acquisition by the company TKST Inc. of an interest in GNSS (Globe Nuclear Services and Supplies) Switzerland and, if you did, how many shares were acquired? What part of the charter capital of GNSS do they represent?*
>
> *Answer: I gave V.D. Pismenny such an instruction in conjunction with Tehsnab. I do not know how many shares were bought up."*

95. In the light of this evidence and of Adamov's, Pismenny's, who on 22nd December 1999 was elected Chairman of the Board of Directors of GNSS (Exhibit 267), and TKST's subsequent behaviour we find it plain that Adamov in the autumn of 1998 instructed Pismenny to arrange preparatory work on the purchase of 49% of the shares in GNSS by TKST.

96. As evidenced by a Memorandum from White & Case dated 15th September 1998 and a letter dated 16th September 1998 from Tenex's Swiss lawyer George Friedli ("**Friedli**") to White & Case (Exhibits 200-201), TKST presented a bid for 49% of the shares in GNSS on 15th September 1998.

97. Tenex contend that Tenex (including its lawyers) and INTERNEXCO treated TKST as a company affiliated with Minatom and acting in the interest of Tenex. In support of this Tenex has presented the following evidence:

98. *First*, Friedli wrote to White & Case in a letter dated 16th September 1998 (Exhibit 201), as follows:

> *"Mr. "Serguey" informed my secretary last night that he had placed an offer at the Swiss Bankruptcy Office in Olten, I do not know the amount of the offer and I assume that the offer was secured by a guarantee of Credit Suisse First Boston. For obvious reasons I will not oppose this offer for the time being."*

99. *Second*, in a memorandum dated 16th September 1998 (Exhibit 201) White & Case informed Tenex that one of the options for Tenex to get the shares was to obtain a letter signed by all Nuexco's creditors requesting that the shares be sold to Tenex and to *"ask Mr. Serguey to withdraw his offer so that Tenex or INTERNEXCO could receive the shares."* Tenex contends that "Mr. Serguey" is Akimenko. This has not been disputed by GNSS and we see no reason to believe that "Mr. Serguey" would be somebody else than Akimenko.

100. *Third*, in a letter dated 17th September 1998 (Exhibit 202) INTERNEXCO informed Tenex that three offers for 49% of the shares in GNSS had been made:

> *" 1. INTERNEXCO GmbH (200.000 CHF)*
> *2. TRIA marine (this 175.000 CHF).*
> *3. ? (must be from MINATOM)"*

101. *Fourth*, INTERNEXCO wrote in a letter dated 23rd September 1998 to Tenex, *inter alia*, as follows:

> *"Evidently, there appears to be a great risk that Tenex and even TKST (acting on behalf of Minatom?), might loose the opportunity to purchase the 49% GNSS share package altogether."*

102. We find this evidence convincing and conclude that Tenex (including its lawyers) and INTERNEXCO treated TKST as a company affiliated with Minatom and acting in the interests of Tenex.

103. In a letter dated 23rd September 1998 (RX 142) and signed by Tenex's Deputy General Director A.V. Shvedov, Tenex requested instructions from Minatom as to further action and stated that the options for further course of action were:

- Option 1 – direct purchase of the shares by Tenex.

- Option 2 – *"purchase of the shares by any other "friendly" participant in the auction"*, which included:

  o Option 2a – purchase of GNSS shares by INTERNEXCO in which Tenex owned 51% of the shares; and

  o Option 2b – *"Purchase of the shares by the American company TKST (100% of the shares of which are owned by State Scientific Centre Troitsky Innovative and Thermonuclear Research Institute). The drawback of this option was "lack of an agreement between AO Techsnabexport and TKST on the terms and conditions of the subsequent transfer of the shares, limited financial resources for guaranteed successful participation in the second stage of the auction. AO Techsnabexport's total costs on achieving the final objective are impossible to estimate until the agreement on transfer is concluded."*

104. Vladimir Vinogradov, the Deputy Minister of Minatom, approved option 2b on the same day, i.e. 23rd September 1998, by subscribing a handwritten note on the first page of Tenex's letter. According to the Record of questioning Vinogradov by the Prosecutor General's Office (Exhibit 208) dated 16th August 2005 Vinogradov replied, *inter alia*, as follows:

Question: *"How was the decision taken to acquire the 49% of GNSS through TKST? What written documents are there relating to this matter?"*

Answer: *"I do not know how the decision was taken or how the negotiations were held. Neither can I say whether there are any documents about this."*

Question: *"What role did E.O. Adamov and other persons play in this decision? What understandings were reached?"*

Answer: *"I can't reply to this question but, I personally, made a recommendation by telephone that TKST take part in the tender for the 49% shares in GNSS. Adamov did not object."*

105. Although it was decided that the shares in GNSS should be acquired by TKST, Tenex has produced evidence that Tenex was very much involved in TKST's purchase of the 49% of shares in GNSS. This evidence, which is overwhelming, includes:

106. A memorandum dated 25th September 1998 from Tenex's lawyers White & Case.

White & Case sent by letter dated 28th September 1998 this memorandum to Mr.
Vinogradov, Chairman, Board of directors, Tenex and Mr. Shiskin, Director General, Tenex (Exhibit 282). This memorandum contained recommendations of actions to be taken by TKST, "Mr. Sergey" (Akimenko) and Mr. Dieter Baumgartner (TKST's representative). In this memorandum White & Case (Carolyn Lamm) noted, *inter alia*, that:

> "*At this time, neither Mr. Sergey, Mr. Baumgartner or ourselves should begin taking positions about the appropriate procedures, i.e. before we have an understanding as to whether or not there is opposition from creditors (who have standing to sue in Switzerland) and, we, together with you, decide what maneuvers will be most likely to permit us to be successful in acquiring the shares. Hence, it is premature to take action and suggest any process, procedure, rules or regulations for the final disposition of the shares...*
>
> *Given all of the competing interests (other than our own), without a coordinated effort there is a good chance that we could loose the opportunity to obtain the shares which are now well within reach. Accordingly we suggest that you request Mr. Sergey and Baumgartner coordinate either directly through Tenex or through myself so that we are able to work in a strategic way to obtain the desired result.*"

107. A circular letter to Nuexco's creditors and a letter to INTERNEXCO, both from the Bankruptcy Authorities (Butz) dated 13th October 1998. (Exhibits 203-204). In the first one Butz noted, *inter alia*, the following:

> "*However, on the creditor's part has been filed a petition to the bankruptcy Authorities. According to the petition the shares have to be sold to TKST, Inc., the highest bidder, for the amount of 200.000.*"

and in the letter to INTERNEXCO, *inter alia*, the following:

> "*The Bankruptcy Authorities are in possession of a petition filed on the creditor's part. According to the petition, the shares have to be sold to TKST, Inc., which submitted the highest offer in the amount of CHF 200.000 for the GNSS shares.*"

108. A circular letter to Nuexco's creditors from the Bankruptcy Authorities (Butz) dated 11th November 1998 (exhibited to Exhibit 287). In this circular letter Butz noted, *inter alia*, the following:

> "*The company Industries Nucleates do Brazil (IBN) did not accept the request submitted by TENEX according to which the shares should be transferred to TKST, Inc.*"

109. An office memorandum dated 5th August 1999 (Exhibit 302) provided by Shvedov to Fraishtut. This memorandum was listing the options available to gain control over the 49% of shares in GNSS.

110. A letter dated 6th August 1999 from Fraishtut to White & Case (Lamm) (Exhibit 303). In this letter Fraishtut gave the following instructions:

> "*After careful consideration of your 15 July 1999 memo concerning the above matter, we determined that the most feasible course of action for us seems to be a participation in an auction organised by Mr. BUTZ of one of the friendly companies like TKST.*"

111. A letter from Tenex's Swiss lawyer Friedli to the members of the Board of Directors of GNSS dated 14th December 1999 (Exhibit 332). In this letter to which the purchase contract dated 9th December 1999 is exhibited, Friedli confirms that the shares of 49% in GNSS in his view are now validly bought from the estate of Nuexco in bankruptcy by TKST for the purchase price of CHF 200.000.

112. On the evidence produced by Tenex we find it plain that Tenex played an active and important role in TKST's purchase of the 49% of shares in GNSS. It is plain from the evidence before us that Tenex took action and assisted TKST to acquire Nuexco's 49 % of the shares in GNSS. The only sensible reason why Tenex would have an interest to take action and assist TKST to acquire the shares in GNSS, and for Tenex's owner, the Russian state, to accept it would, however, have been the understanding that TKST was controlled by the Russian state and that the transfer of Nuexco's 49 % of the shares in GNSS to TKST was a method for Tenex to get control of the shares. This is further supported by the fact that even Pismenny, when under questioning as a suspect by the General Prosecutor's office (Exhibit 251- Record of Questioning of Pismenny dated 15th May 2005, page 3), made statements clearly indicating that there was an arrangement that TKST would buy 49% of the shares in GNSS in Tenex's interests.

**4.4.3.3 Release and discharge of GNSS debt to Tenex**

113. An impediment for TKST's control over GNSS and its business was GNSS's debt to Tenex of about US$ 113 million. However, on 31st December 1999 GNSS, represented by Pismenny and Chernov, and Tenex, represented by Fraishtut and a bookkeeper, entered into a Release and Waiver Agreement (RX 144). Pursuant to this agreement Tenex *"irrevocably and gratuitously"* discharged GNSS of its obligation to pay Tenex US$ 113,088,360.00, which was GNSS's debt for nuclear supplies involving Nuexco. The remaining amount of the debt US$ 19,879, 028 was paid by GNSS to Tenex.

114. Tenex contend that the only plausible explanation for the debt release was the image of TKST as a Tenex-friendly company controlled by TRINITI, which would transfer the shares to Tenex upon the latter's request. No other plausible explanation has even been alleged in this arbitration. According to the Recitals of the Release and Waiver Agreement Tenex desired to forgive GNSS's liability gratuitously as a result of, *inter alia*, the fact that Tenex "is a principal shareholder of GNSS" (Recital E).

115. Such a debt release without any consideration would also otherwise be difficult to understand as can be seen from a letter from Friedli to White & Case dated 4th December 2000 (Exhibit 362). In this letter Friedli mentions various alternatives, e.g. extensions of the subordination agreements or bankruptcy of GNSS.

116. We therefore agree with Tenex's contention that the only plausible explanation for the debt release was the image of TKST as a Tenex-friendly company controlled by TRINITI, which would transfer the shares to Tenex upon the latter's request.

## 4.4.3.4 Conclusion of the GNSS-Tenex Contract

117. When TKST obtained 62 % of the shares in GNSS, GNSS was reselling HEU Feed on the basis of the Contract between Tenex and GNSS No. 0884367 72/80007-02D dated 27th September 1996 (**"1996 Contract"**) (Exhibit 364). As pointed out by Tenex the structure of the sales under the 1996 Contract was as follows:

- GNSS would enter into contracts with end users for the sale of HEU Feed and would provide these contracts to Tenex (Article 2.02).

- Tenex and GNSS would enter into contracts (in the form of addenda to the 1996 Contract) for the sale of the amounts of HEU Feed that GNSS undertook to sell to each end user (Article 1.03).

- The prices would be "*mutually agreed upon*" between Tenex and GNSS in the corresponding addenda to the 1996 Contract (article 3.01).

118. The 1996 Contract was concluded for the term "*until all UF6nat to be delivered by USEC to TSE under the USEC Contract has been resold to End Users*" (Article 1.02), i.e. until the year 2013.

119. Tenex contend that Chernov in 1999, when TKST was in the process of taking over GNSS, suggested for the first time, that contractual relations between Tenex and GNSS be reconsidered and requested that a new contract or an amendment to the 1996 Contract be concluded. Among the changes suggested by Chernov, the most significant were that (1) the price at which Tenex sells HEU Feed to GNSS should no longer be dependent on the price at which GNSS sells the HEU Feed to end users, and that (2) the price at which GNSS sells HEU Feed to end users should no longer be disclosed to Tenex. This is supported by the testimony of an employee at Tenex, Mr. Mikhail Aboimov, who was in charge of contracts within the framework of HEU-LEU Agreement. He testified as a witness under questioning by the General Prosecutor's Office on 25th January 2006 (Exhibit 365 page 3), *inter alia*, that

"*Since March 1999, when there was a contract signed with the western companies, it became necessary to amend the existing contract of 1996 as the volume of material stipulated in the contract between GNSS and OAO "Techsnabexport" exceeded the maximum material available to the Russian side by the terms of the contract with the western companies. To address this discrepancy we could reduce the amount of material for GNSS. Mr Chernov's position was that GNSS should be treated on equal terms with the western companies get an equal reference price and not to have an obligation to inform OAO "Technsnabexport" about end users and terms and conditions of contracts with them.*"

120. Another employee at Tenex, Mr. Boris Gvodzev testified as a witness under questioning by the General Procurator's office on 23rd January 2006 (Exhibit 193 page 6), *inter alia*, that

"*As soon as Techsnabexport and the three Western Companies (Cameco, Cogema and Nukem) agreed new terms for selling the natu-*

*ral component under the HEU-LEU project and the contract was*

*signed in March 1999, Mr. Chernov put the question of whether these*

*new terms should be applicable in full to the contract between GNSS*

*and Techsnabexport."*

121. Moreover, it is clear from Mr. Aboimov's and Mr. Gvozdev's testimonies that they opposed those suggestions made by Mr. Chernov.

- Mr. Aboimov testified (Exhibit 365) that: *"The terms and conditions of the existing contract were transparent, i.e. GNSS worked for a fixed remuneration, contracts with end-users, the volumes and prices were stated in addenda to the contract. Uranservis managers, including myself, believed that a new contract with GNSS was to be based on the same principles."*

- Mr. Gvozdev testified (Exhibit 193 page 6) that: *"Chernov sent Techsnabexport a draft supplement to the existing contract. According to the existing procedure at Techsnabexport, all addenda, like new contracts, must be vised by the company's relevant subdivisions. This means that the draft supplement from Chernov came to my department. I drafted in writing a list of comments on the draft."*

122. On or about 26th January 2006 Chernov came to Moscow. Chernov and Pismenny handed to Fraishtut two letters dated 26th January 2000 (RX 20 and RX 60), in which GNSS suggested terminating the 1996 Contract and entering into the GNSS-Tenex Contract. A draft of the GNSS-Tenex Contract prepared by GNSS was attached to one of these letters.

123. From the testimony given by Mr. Aboimov before this Tribunal and the witness statements at the General Prosecutor's Office by Messrs. Grigoriev, Aboimov and Mikerin, who at that time was a deputy Director of Tenex's commercial division (the firm Uranservice), we conclude that Tenex's officers, in particular those who were responsible for commercial terms of Tenex's contracts, opposed the conclusion of the GNSS-Tenex Contract on the terms offered by GNSS, and that GNSS avoided any negotiation of the draft and no such talks ever took place.

- Mr. Griogriev testified, as a witness under questioning by the General Prosecutor's office (Exhibit 366 page 4). He said, *inter alia*, that: *"Standard contract approval procedure in the departments of "Techsnabexport" was not followed, which was explained by the fact that some of those disagreed with the offered draft, and the time span given to analyse it was short. I reported it to Techsnabexport's Director General Mr. Fraishtut*

*that there was no copy of the contract with signatures of approval from all*

*concerned departments...*

*We failed to negotiate with Mr. Chernov to the point of the new draft con-*

*tract as he alleged meetings at the Ministry of Atomic Energy and was*

*physically unavailable until the day the contract was signed. Standard con-*

*tract approval procedure in departments of "Techsnabexport" was not fol-*

*lowed, which was explained by the fact that some of those disagreed with*

*the offered draft, and the time span given to analyse it was short."*

- Mr. Aboimiov testified as a witness under questioning by the General
  Prosecutor's Office (Exhibit 365, page 4), *inter alia,* that: *"The conditions*
  *offered...the contracted price was fixed between GNSS and OAO*
  *"Techsnabexort" and did not depend on the price received by GNSS from*
  *end users. These were the very conditions opposed by Uranservice. Mr.*
  *Fraishtut appended his instruction on the document to have suggestions to*
  *GNSS draft contract. Carrying out this instruction, Uranservice and the*
  *Strategic Analysis and Marketing Department started to work out their*
  *suggestions. At the same time attempts were made to negotiate with Mr.*
  *Chernov to discuss the draft. Such negotiations did not take place for rea-*
  *sons that are unknown to me."*

- Before this Tribunal Mr. Aboimov testified on 3rd April 2006 and said
  (Transcript Page 75), *inter alia,* that: *"So according to this obligatory pro-*
  *cedure I distributed the project, the draft contract to the heads of units,*
  *and one or two days later I received their replies. None of the respective*
  *units agreed either to the concept or the mechanism, or to the commercial*
  *provisions of the draft contract. --There are special strong objections*
  *raised by my unit and its director, Mr. Mikerin, and then another unit*
  *which was responsible for price setting and for strategy headed by Boris*
  *Gvodzev.—On the basis of the position of these units I proposed to Mr.*
  *Chernov to have negotiations on the contract, but he was too busy, he had*
  *meetings scheduled with Minatom, including the then minister Adamov.*
  *However, I was able to present to Mr. Chernov the position of the manag-*
  *ers of Technsnabexport with respect to the unacceptability of this contract*
  *and its concept."- Mr. Chernov listened to my proposals, and he suggested*
  *making some adjustments or amendments in the draft, which I did on my*

*computer, mainly directing the clerical errors or the misprints. He also asked me to print out several copies of the draft contract and the letters. I saw that he took the copies and went to the office of Mr. Fraishtut the General Director of Techsnabexport. Since my office was situated next to Mr. Fraishtut's office, I also saw that the deputy director, Mr. Grigoriev, soon went to Mr. Fraishtut's office as well. So this was on or around 31ˢᵗ of January, probably on the 30ᵗʰ January.- A short time after Mr. Chernov came to me and presented a signed copy of the contract, I saw there was the signature of Mr. Pismenny, the Chairman of the Board of Directors – I should probably add that I saw Mr. Pismenny in Moscow at that time, and, on the part of Techsnabexport, the signature of Mr. Fraishtut and Mr. Grigoriev.*

- Mr. Vadim Merkin, who at that time was a deputy Director of Tenex's commercial division (the firm *Uranservice*), testified as a witness under questioning by the General Prosecutor's Office on 8ᵗʰ February 2006 (Exhibit 367, pages 3-4), *inter alia*, that: *the draft contract was prepared and sent to Techsnabexport personally by GNSS's president Chernov in the first days of 2000…At that stage, we – I personally – had reason to believe that the conditions set forth in the draft contract did not suit the interests of either Techsnabexport or the Russian side in general, because the price mechanism, the general terms of the contract, and the obligations of GNSS with regard to the execution of the terms of the contract were drawn up such that they clearly reflected the interests of GNSS only, and not Techsnabexport. We felt that it was possible to negotiate, given that it was our company, and to convince Chernov of the need to adopt terms for the draft contract that were more suitable. Since the contract involved supply of the natural component under a long-term mechanism all the way to the end of the HEU-LEU Agreement, careful analysis was required, as was a thorough study of the draft that involved enlisting several functional subdivisions of the company that were responsible for price-setting policy and mutual settlements."*

#### 4.4.3.5 The Circumstances in which the GNSS-Tenex Contract was concluded

124. On 20th December 1999, i.e. shortly before the GNSS-Tenex Contract was concluded the Shareholders' Meeting of GNSS approved a provision in the Charter for GNSS to the effect that Resolutions of the Board of directors are adopted by a majority of the votes of the voting members under the condition that there is the approval of at least one member of Russian citizenship (and not two members of Russian citizenship as recommended by Tenex's lawyers). This decision was made following a Meeting of the Board of Directors of 3rd September 1999 at which Pismenny took the position that "*it is superfluous to have two Russian votes. This requirement might paralyze the decision making process.*" Fraishtut, who was present at the meeting did not object to that (Exhibits 271-275).

125. On the evidence before the Tribunal we conclude (¶123) that standard contract approval procedure in Tenex was not followed when the GNSS-Tenex Contract was concluded and no reason has been shown why it would have been in the interest of Tenex to replace the 1996 Contract with the GNSS-Tenex Contract as presented by GNSS.

126. Tenex contend that the only reason why Tenex concluded the GNSS-Tenex Contract was that, when the Contract was concluded, i.e. in January 2000, everyone at Tenex, except those who were members of the Group, believed that GNSS was a company fully owned by the Russian state (through TKST and Tenex) and controlled by Tenex and/or Minatom. In this context Tenex also points out that, shortly before the conclusion of the GNSS-Tenex Contract, on 20th December 1999, 62 % of the shares in GNSS were re-registered in the name of TKST, a company owned by TRINITI and portrayed as acting in Tenex's interests.

127. Moreover, Tenex contend that because the Group portrayed and Tenex treated GNSS as a company owned and controlled by Tenex and Minatom (which implied that Tenex could direct GNSS's actions), negotiation and agreeing of all specific terms and conditions of the GNSS-Tenex Contract had not become a matter of particular concern for Tenex at the time when the GNSS-Tenex contract was signed.

128. Above (*supra* ¶112) we have found that the only plausible reason why Tenex would have an interest to take action and assist TKST to acquire the shares in GNSS, and

for Tenex's owner, the Russian state, to accept it would have been the understanding that TKST was controlled by the Russian state and that the transfer of Nuexco's 49 % of the shares in GNSS to TKST was a method for Tenex to get control of the shares. We have thus agreed with Tenex's contention *that* TKST was treated by everyone as a company ultimately owned by the state and acting in Tenex's interests, and *that* therefore the shares in GNSS were transferred to TKST and *that* Tenex actively assisted TKST to get the shares, and *that* everyone at Tenex, except those who were members of the Group, believed that TKST would purchase and hold the 49 % of shares in GNSS in the interests of Tenex.

129. We have further found *(supra* ¶116) that the only plausible explanation for the debt release was the image of TKST as a Tenex-friendly company controlled by TRINITI, which would transfer the shares to Tenex upon the latter's request.

130. It is plain from the evidence before as that TKST was not a company acting in the interests of Tenex or the Russian state. As shown by written evidence before us (Exhibit 240) TKST and its President, Akimenko were closely associated with Texi, a company incorporated in 1991 in Delaware (Exhibits 247- 248). Akimenko was President of Texi (Exhibit 249). Texi was owned by Pismenny, Pismenny's wife Sokolina and Pismenny's daughter Tatiana Simeonova (Exhibit 250).

131. A draft Joint Venture Agreement of November 1998, secured from Kaushansky's computer files (Exhibits 241-243), provides, *inter alia,* that [Texi] and [Omeka] *"have formed a joint venture to bid and if they are successful, to acquire 49% of [GNSS] from the bankruptcy authorities..."*

132. According to the draft JVA, TKST was used as an agent of Texi and Omeka for the purposes of acquiring the 49% of shares in GNSS

*"Whereas TKST has acted as an agent for the bidders and has bid in its own name for the 49% of the outstanding stock of [GNSS] on behalf of the joint venture..."* (Recitals).

*"Upon acceptance of [TKST's] bid ..., notwithstanding the fact that 49 % of the shares shall be held by TKST as the agent for Omeka and Texi in equal proportions of 24 1/2% each* (Clause 1)...

133. Omeka was incorporated in Pennsylvania in August 1994 (Exhibit 44). Omeka's shareholders were Adamov (600 shares), Adamov's wife Olga Pintchouk (200 shares), Kaushansky (100 shares) and Kaushansky's wife Lyuba Kaushansky (100 shares) (Exhibits 53-59).

134. On 10th April 2000, TKST's 62 % of the shares were transferred from TKST to Texi. As can be seen from Texi's confirmation and from the written consent of the Board of Directors of the TKST, both dated 4th April 2000, Pismenny, acting as Texi's representative (Exhibit 256), and Pismenny and Akimenko acting, as TKST's directors (Exhibit 234), approved this transfer on the part of TKST. Texi, unlike TKST, was a private company controlled by Pismenny, and had no connection with TRINITI. Shortly after TKST transferred its 62 % of the shares in GNSS to Texi and the Release and Waiver Agreement was signed, GNSS started to pay dividends to Texi, which shortly thereafter started to pay significant amounts to Pismenny and his wife Sokolina (Exhibits 24-25 and 240).

135. There can thus be no doubt that TKST did not act in the interest of Tenex or Minatom and did not purchase and acquire the 62 % of the shares in GNSS for and in the interest of Tenex or the Russian Federation.

136. GNSS has not shown or even alleged that anyone else than the members of the Group were aware of the fact that TKST was not a company acting in Tenex's interest. At the time when the GNSS-Tenex Contract was concluded, Pismenny and Adamov were aware not only of the fact, that TKST did not act in Tenex's interest, but also that there was an arrangement (JVA) for transferring by TKST of 62 % of the shares in GNSS to private companies controlled by Pismenny and Adamov and owned by them and members of their families.

## 4.4.3.6 The Tribunal's conclusions

137. We have now in the light of the Tribunal's findings to consider (a) whether the circumstances, in which the GNSS-Tenex Contract was made, were such that having knowledge of such circumstances, it would be inequitable to enforce the GNSS-Tenex Contract and (b) whether GNSS must be presumed to have had such knowledge when the GNSS-Tenex Contract was concluded.

138. We have found that nobody in Tenex or Minatom, except the members of the Group, was aware of the fact that TKST, which owned 62 % of the shares in GNSS, was not acting in Tenex's interest. Does this fact justify the conclusion that the circumstances in which the GNSS-Tenex Contract was made were such that, having knowledge of them when the GNSS-Tenex Contract was concluded, it would be in-

equitable to enforce that contract and that therefore GNSS may not rely on the Contract?

139. *First*, the evidence submitted clearly demonstrate that, when the GNSS-Tenex Contract was concluded, there were circumstances affecting Tenex's interests and perspectives in a certain area of its economic activities, including its rights to shares and dividends and the marketing and pricing of the goods supplied by Tenex. Among other things the GNSS-Tenex Contract itself was less advantageous for Tenex than the 1996 Contract. No plausible reason has been shown because of which it could have been in the interests of Tenex to replace the 1996 Contract with the GNSS-Tenex Contract. We therefore conclude, as asserted by Tenex, that the only reason why Tenex concluded the GNSS-Tenex Contract was that Tenex believed that GNSS was a company fully owned by the Russian state (through TKST and Tenex) and controlled by Tenex and/or Minatom.

140. *Second*, it is plain that GNSS was aware of all the above mentioned circumstances in which the GNSS-Tenex Contract was concluded. Moreover, as a matter of fact, its officers played an active role in creating such circumstances with their negative effect to Tenex as a legal entity.

141. On these findings we conclude that the circumstances in which the GNSS-Tenex Contract was made were such that, having knowledge of those circumstances, it would be inequitable to enforce the GNSS-Tenex Contract. Since GNSS was aware of these circumstances when the GNSS-Tenex Contract was concluded, GNSS may not rely on that Contract. GNSS's claim for damages because of breach of contract is therefore not made out.

142. We observe in passing, that given our findings we have not needed to consider GNSS's request to confirm that the GNSS-Tenex Contract was avoided effective 5th November 2004 or any quantum issues, including the qualification of the Contract. Neither have we needed to consider Tenex's arguments that the GNSS-Tenex Contract is invalid by virtue of the Swedish law principle of underlying assumptions, or because of the fact that it violates law or is contrary to good practice (*pactum turpe)*, or as a matter of international public policy.

**4.5 Costs**

143. Both parties have made written submissions to us on the issue of costs. There is no agreement between the parties relating to costs. Therefore, the Arbitral Tribunal may pursuant to Article 41 of the SCC Arbitration Rules, at the request of a party, in an Award or other order by which the arbitral proceedings are terminated order the losing party to compensate the other party for legal representation and other expenses for presenting its case. Each party has claimed that the other party shall compensate all its cost for legal representation and other expenses for presenting its case. However, the Tribunal can also take into account other circumstances, e.g. procedural orders and partial awards.

144. GNSS claim that the Tribunal order Tenex to compensate GNSS for its legal representation and other expenses for presenting its case in the amount of USD 5,545,229,02 plus interest according to Sections 4 and 6 of the Swedish Interest Act from the date of this award until the date of full payment. Tenex claim that the Tribunal order GNSS to compensate Tenex for its legal representation and other expenses for presenting its case in the amount of USD 7,566,298,53 and EUR 1,229,857,81 with interest at a rate corresponding to the Swedish official reference rate plus eight per cent per annum, from the date of this award until the date of full payment. Both parties have by letters dated 15 February 2007 informed the Tribunal that they do not accept the amounts the other party has claimed.

145. The Tribunal has discretion to fix the amount it considers proportionate and reasonable. Applying these criteria and having regard to the outcome of the case, the partial award dated 31st August 2006 and the procedural orders and decisions dated 31st August 2004, 4th April 2005 and 5th July 2005, the Tribunal awards that GNSS shall reimburse Tenex in the amount of USD 5,000,000 and EUR 800,000 with interest corresponding to the Swedish official reference rate plus eight percent per annum from the date of this Award until full payment.

146. The costs of the arbitration have been determined by the Arbitration Institute of the Stockholm Chamber of Commerce as follows:

*Professor Allan Philip*

| | |
|---|---|
| Fee | EUR 10,000 |
| Expenses | EUR 736 |

*Justice Gustaf Möller*

| | |
|---|---|
| Fee | EUR 333,200 |
| Expenses | EUR 54,455 |

*Advokat Karl-Erik Danielsson*

| | |
|---|---|
| Fee | EUR 205,920  and VAT 25% |
| Expenses | SEK 34,215 |

*Professor Sergei N. Lebedev*

| | |
|---|---|
| Fee | EUR 205,920 |
| Expenses | EUR 13,273 |

SCC Institute

| | |
|---|---|
| Administrative fee | EUR 60,000 |

# 5 A W A R D

For the reasons set out above, the Tribunal decides as follows:

1. All GNSS's claims are dismissed.
2. GNSS is ordered to pay Tenex forthwith compensation for its legal representation and other expenses for presenting its case USD 5,000,000 and EUR 800,000 with interest corresponding to the Swedish official reference rate plus eight percent per annum from the date of this Award until full payment, i.e. at an annual rate calculated in accordance with Section 6 of the Swedish Interest Act as from the date of the Award until the date of full payment.
3. The parties are jointly and severally liable to pay the costs of the arbitration as specified above at ¶146. As between the parties 2/3 of these costs shall be borne by GNSS and 1/3

by Tenex. The costs will be drawn from the advances paid by the parties to the SCC Institute.

In case the competent tax authorities require that VAT or additional VAT shall be paid on the compensation paid to the arbitrators, the parties are further jointly and severally ordered to pay to the respective arbitrator as compensation an amount corresponding to the required VAT.

Stockholm 11th June 2007


Karl-Erik Danielsson

(Dissenting)

Sergei N. Lebedev


Gustaf Möller

**Dissenting Opinion (relating to the reasons)**

The Arbitrator *Mr. Karl-Erik Danielsson* makes the following considerations.

I am in agreement with the majority in respect of the questions of the arbitrability of the present dispute, GNSS's standing in this arbitration, and the jurisdiction of the Tribunal in respect of purported criminal matters. I also agree with the majority that the GNSS-Tenex Contract is not invalid due to fraudulent deception pursuant to Section 30 of the Swedish Contracts Act (SFS 1915:218) (the "**Act**"). However, in respect of the question of whether the GNSS-Tenex Contract is invalid pursuant to Section 33 of the Act, I have a dissenting opinion as set forth below.

The natural starting point for an analysis of whether the GNSS-Tenex Contract is invalid pursuant to Section 33 of the Act is the provision itself. The provision has the following wording in its English translation.

> "A legal act which would otherwise be deemed valid may not be relied upon where the circumstances in which it arose were such that, having knowledge of such circumstances, it would be inequitable to enforce the legal act, and where the party in respect of whom such legal act was performed must be presumed to have had such knowledge."

The provision set forth in Section 33 of the Act is a general clause. Nonetheless, it contains important limitations. For instance, just as the provision set forth in Section 30 of the Act, the provision exclusively addresses the circumstances in which the legal act arose, and it only concerns the relationship between the parties.[1]

In order for Section 33 of the Act to apply, both an objective and a subjective requirement must be fulfilled. As regards the *objective* requirement, certain circumstances must be present when the legal act arose. However, such circumstances have not been defined otherwise than that, having knowledge of them, it would be inequitable to enforce the legal

---

[1] *See* Adlercreutz, Avtalsrätt I, 12 ed., 2002, p. 269.

act. Further, as regards the *subjective* requirement, the other party must be presumed to have had knowledge of these circumstances at the time when he learned of the legal act. In the event that the other party has no knowledge of the circumstances, the conduct cannot be deemed *inequitable*. However, there is no requirement that the other party has regarded his conduct as being inequitable. The question of whether the conduct is inequitable is to be determined objectively; ultimately by a court or an arbitral tribunal.[2]

As a result of the vague wording of the provision, Section 33 of the Act has a wide range of applicability. According to its wording, it also encompasses situations covered by the other, more specific, grounds for invalidity set forth in Chapter 3 of the Act. In the *travaux préparatoires*, it has been stated that the provision has a subsidiary character in relation to such other grounds for invalidity.[3] Thus, Section 33 of the Act can be characterised as *lex generalis* in relation to more specific grounds for invalidity set forth in either Chapter 3 of the Act or in other legislation.

In the *travaux préparatoires*, two main categories of situations in which Section 33 of the Act may be applied have been outlined. *First*, Section 33 of the Act applies to situations where the person carrying out the legal act has been influenced by circumstances which have incapacitated him from forming a clear opinion of the meaning and consequences of the legal act, *i.e.*, mainly milder forms of mental defects. *Second*, the provision applies to situations where the other party, without having fraudulently deceived the party into carrying out the legal act, in an inequitable manner has taken advantage of the party's lack of knowledge of certain factual circumstances.[4]

Case law in relation to Section 33 of the Act has confirmed the view thus advocated in the *travaux préparatoires*. The provision has especially been applied as a supplement to the provision set forth in Section 30 of the Act regarding fraudulent deception. However, Section 33 of the Act does not cover all types of so-called undue influence. Moreover, it is

---

[2] *See* Adlercreutz *op.cit.* p. 269 *et seq.*
[3] *See* Förslag till lag om avtal och andra rättshandlingar på förmögenhetsrättens område, lag om avbetalningsköp m.m., avgivna den 31 januari 1914 av därtill utsedda kommitterade, p. 133.
[4] *See* Förslag till lag om avtal och andra rättshandlingar på förmögenhetsrättens område, lag om avbetalningsköp m.m., avgivna den 31 januari 1914 av därtill utsedda kommitterade, p. 134 *et seq.*

specifically worth noting that Section 33 of the Act has been applied in a rather restricted number of cases. On the whole, Swedish courts, particularly in recent years, have set the requirements high for invalidity and other types of interference in contractual relationships.[5]

Due to the manner in which Tenex has chosen to present its case, it is against the above legal background that the merits of the case are to be considered. However, in my opinion, the facts regarding the conclusion of the GNSS-Tenex Contract, as alleged by Tenex, instead give rise to legal issues of a kind which, under Swedish law, typically are dealt with in company law. In particular, such issues are addressed by the principles on *ultra vires* acts now contained in the provisions set forth in Chapter 8, Section 42 of the Swedish Companies Act (SFS 2005:551). In the event that a company representative has performed a legal act on behalf of the company and thereupon acted in violation of the provisions of the Swedish Companies Act regarding the authority of company organs, such legal act is not enforceable against the company and is, thus, invalid.

In the *travaux préparatoires*, it has been argued that legal acts in contravention of the provisions set forth in the Swedish Penal Code in certain cases constitute *ultra vires* acts.[6] My view is also that there are strong arguments why Mr. Fraishtut's alleged conduct – without ruling on whether or not Tenex has fulfilled its burden of proof in this respect – would, under Swedish law, constitute the crime *breach of faith committed by an agent against his principal* (Swedish *trolöshet mot huvudman*) (*see* Chapter 10, Section 5 of the Swedish Penal Code). However, I see no reason to further elaborate on this issue.

The provisions on *ultra vires* acts set forth in Chapter 8, Section 42 of the Swedish Companies Act are applicable only to Swedish companies. On the other hand, Tenex has not challenged the GNSS-Tenex Contract based on an allegation that the persons signing the GNSS-Tenex Contract on behalf of Tenex, *i.e.*, Mr. Fraishtut and Mr. Grigoriev, in any way exceeded their authority. Nor has any evidence in respect of the contents of Russian

---

[5] *See* Adlercreutz *op.cit.* p. 272 *et seq.*
[6] *See* Government Bill 1993/94:196 p. 169. *See* also Johansson, Nials Svensk associationsrätt i huvuddrag, 8 ed., 2001, p. 246.

law, which is Tenex's *lex corporationis*, in this matter been presented. Consequently, the Tribunal is prevented from examining whether the GNSS-Tenex Contract is invalid due to principles on *ultra vires* acts, whether under Swedish law or Russian law.

The question is then whether Section 33 of the Act can be applied to the facts regarding the conclusion of the GNSS-Tenex Contract, notwithstanding that the provisions regarding *ultra vires* acts would be applicable had Tenex been a Swedish company. This issue has been addressed in the *travaux préparatoires*, where it has been asserted that the fact that a company is bound by a legal act according to the company law principles on *ultra vires* acts does not necessarily imply that the legal act at all times is binding on the company. Particularly in situations where the other party has been aware that a company representative has exceeded his authority or violated the provision regarding the objects of the company set forth in the articles of association there probably is some room for the company to avoid being bound with reference to the provisions regarding invalidity contained in the Act, principally Sections 33 and 36.[7]

Thus, even though, theoretically, Section 33 of the Act might be applied alongside the principles on *ultra vires* acts now contained in the provisions set forth in Chapter 8, Section 42 of the Swedish Companies Act, the Swedish legislator has intended that this be the case only very rarely. This is also evidenced by the fact that I have not found any published case law where Section 33 of the Act has been applied in such situations. Add to that the fact that Swedish courts in general are extremely reluctant to invalidate contractual relationships, my overall conclusion is that there are not sufficient conditions to declare the GNSS-Tenex Contract invalid pursuant to Section 33 of the Act.

In addition, Tenex has asserted that the GNSS-Tenex Contract is invalid on the basis of the principle of underlying assumptions (Swedish *förutsättningsläran*) and the principle that agreements that violate the law or are contrary to good practice, both of which are general Swedish contract law principles, though seldom applied by Swedish courts. In my view, the circumstances in the case are not such that either of these principles can be applied to

---

[7] *See* Government Bill 1993/94:196 p. 171.

invalidate the GNSS-Tenex Contract. Nor can this be achieved by Tenex's reference to international public policy.

In light of the above, I find that the GNSS-Tenex Contract cannot be declared invalid or unenforceable on the basis of any of the grounds alleged by Tenex. Having also regard to the ruling of the Tribunal in its partial award rendered on 31 August 2006, I conclude that the purported termination by Tenex of the GNSS-Tenex Contract on 3 November 2003 was unlawful and that, therefore, Tenex as a result of this breach of agreement is liable to pay compensation to GNSS for damage incurred by GNSS.

The question is then what damage GNSS has incurred as a result of Tenex's breach of agreement. In this respect, GNSS has asserted that, pursuant to Article 76 of the United Nations Convention on Contracts for the International Sale of Goods ("**CISG**"), GNSS, having avoided the GNSS-Tenex Contract, may "recover the difference between the price fixed by the contract and the current price at the time of avoidance as well as any further damages recoverable under Article 74." The amount of damages sought has also been calculated according to Article 76 of the CISG. In addition, GNSS has claimed further damages under Article 74 of the CISG if damages based on Article 76 of the CISG are awarded for only part of the Total Quota Quantity.

In my view, both damages calculations invoked by GNSS presuppose the breach of a sale of goods contract. Tenex has disagreed that the GNSS-Tenex Contract is a sale of goods contract, and has claimed that the GNSS-Tenex Contract merely indicates the conditions on which sale of $UF_6$ Feed Component may take place if certain requirements are met. Therefore, it is a matter of decisive importance to establish whether the GNSS-Tenex Contract itself constitutes a binding contract for the sale of goods. The natural starting point for this analysis is the wording of the provisions of the GNSS-Tenex Contract, and the question to be answered is whether the GNSS-Tenex Contract itself contains binding purchase and sale transactions.

Provisions regarding quantities, quota, deliveries and term are contained in Article II of the GNSS-Tenex Contract as amended by GNSS-Tenex Contract Amendment 4. In this

context, Section 2.01(i) of the GNSS-Tenex Contract should first be noted. The provision has the following wording.

> "Within the term of this Contract GNSS shall be exclusively entitled to purchase from [Tenex] [$UF_6$ Feed Component] in annual amounts, equal to the maximum quantity, which [Tenex] is eligible to retain, market and sell to GNSS under the Western Contract (the "Total Available Quantity"), which includes: – – –"

Thus, under Section 2.01(i) of the GNSS-Tenex Contract, Tenex grants an exclusive right to GNSS to purchase $UF_6$ Feed Component from Tenex. However, the provision does not impose an obligation on Tenex to sell certain fixed quantities of $UF_6$ Feed Component to GNSS. Nor does it impose an obligation on GNSS to purchase certain fixed quantities of $UF_6$ Feed Component from Tenex.

A provision imposing an obligation on GNSS is instead set forth in Section 2.01(iv) of the GNSS-Tenex Contract which provides that "[s]ubject to Sections 1.01 and 2.03(vi) of this Contract, the annual Quota Quantity represents the minimum annual purchase obligation of GNSS under this Contract." Further, by Section 1 of GNSS-Tenex Contract Amendment 4, GNSS commits to purchase certain larger quantities which, *inter alia*, results in GNSS being obligated to purchase the entire Quota Quantity under Section 2.01(i)(a) of the GNSS-Tenex Contract beginning with calendar year 2002, and each year thereafter during the remaining life of the GNSS-Tenex Contract. There is, however, no corresponding express undertaking by Tenex, either in the GNSS-Tenex Contract or in GNSS-Tenex Contract Amendment 4, to sell any quantities of $UF_6$ Feed Component to GNSS. In my opinion, this clearly indicates that the GNSS-Tenex Contract (as amended) does not itself impose an obligation on Tenex to sell $UF_6$ Feed Component to GNSS, or, expressed differently, contain a binding sale transaction.

When determining whether the GNSS-Tenex Contract itself contains binding purchase and sale transactions the provision set forth in Section 2.03(iii) of the GNSS-Tenex Contract should also be taken into account. The provision has the following wording.

> "For each delivery to its customer, GNSS shall specify the quantity and delivery date by written notice (the "Delivery Order") to [Tenex] given as soon as possible, but at least 90 days prior to the delivery date designated in such notice. – – –

> Delivery of the Delivery Order to [Tenex] by GNSS shall result in a binding contract of purchase and sale for the quantity of [$UF_6$ Feed Component] therein stipulated on the terms and conditions of this Contract. [Tenex] shall acknowledge receipt of each Delivery Order it receives by signing and returning a copy thereof to GNSS. However, failure to do so by Tenex shall not invalidate the Delivery Order. – – –"

As is apparent from this provision, the GNSS-Tenex Contract contains a specific mechanism for determining when sale of goods contracts come into effect, *i.e.*, by the delivery of a Delivery Order to Tenex by GNSS. Only then is Tenex under an obligation to sell $UF_6$ Feed Component to GNSS. The existence of the provision clearly contradicts the interpretation that the GNSS-Tenex Contract itself constitutes a binding contract for the sale of goods. Instead, it is plain that the parties have intended to lay down certain conditions for binding purchase and sale transactions. Further, it is worth noting that the provision set forth in Section 2.03(iii) of the GNSS-Tenex Contract has not been altered by GNSS-Tenex Contract Amendment 4 which in Section 1 provides that "GNSS shall continue to provide the Delivery Orders for each delivery of the Quota Quantity under Section 2.03(iii) of the Contract".

Against the above background, I conclude that the GNSS-Tenex Contract itself cannot be said to constitute a binding contract for the sale of goods. In support of its claims, GNSS has, as stated above, only invoked damages calculations which presuppose the breach of a sale of goods contract. Therefore, I am prevented from examining whether GNSS is entitled to compensation from Tenex based on alternative damages calculations.

Thus, my overall conclusion is that GNSS action is unfounded. Consequently, I am in agreement with the majority that all GNSS claims should be dismissed. I also agree with the majority in respect of the cost issues.